# WM. J. GARRETT ET AL. *vs.* ANNIE B. KERNEY ET AL.

*Executors and Administrators—Distribution Under Direction of Orphans' Court After Notice—Administrator Not Liable to Claimant After Distribution Under Such Direction—Depositions.*

Upon the death of a man intestate in 1895, his estate was claimed by a woman who was taken to be his widow and by two persons who were alleged to be his children, but the fact of their being his children was denied by some; and it was also found that the deceased had left two sisters and a nephew and niece. The administrator of the estate obtained from the Orphans' Court an order appointing a future day for a meeting in the Court of the persons entitled to shares of the said estate, to the end that distribution might then and there be made under the Court's direction. Publication of the order was made as therein directed. This order was passed in pursuance of Code, Art. 93, sec. 142, which provides that any administrator or executor shall be entitled to appoint a meeting of persons entitled to distributive shares, etc., and distribution may be then and there made under the Court's direction and control, and that distribution made under the direction of the Court shall protect and indemnify the administrator or executor acting in obedience to it. After the day fixed by the order for the meeting, an agreement was made by the administrator and by the attorneys of all of said parties claiming the estate, by which it was stipulated that distribution should be made among them in certain designated proportions. The object of this agreement was to avoid litigation on the question as to whether the two alleged children were entitled to the remainder after deducting the share of the widow, or whether the same went to the collateral kindred of the deceased. The agreement expressly provided that it should be subject to the approval of the Orphans' Court. An account was stated in accordance with this agreement and was ratified by the Court, but no formal order was passed directing distribution to be made in that manner. Seven years after the passing of this account, a petition was filed in the Orphans' Court which alleged that the petitioners were the lawful wife and daughter of the deceased, whom he had left in Ireland thirty-five years before his death in 1895, and that they had only recently learned of his whereabouts and demise. The petition prayed that the orders ratifying the account be stricken out and that the administrater be ordered to account to the petitioners for the estate. *Held*, that the distribution made as above set forth was not made in pursuance of the agreement of the parties, but was made under the direction and control of the Orphans' Court, according to the statute, and that consequently the administrator is not personally liable to the petitioners.

When depositions are taken *ex parte*, under Code, Art. 35, sec. 17, interrogatories should be filed with the Notary and returned with the depositions.

*Decided March 6th, 1908.*

Appeal from the Orphans' Court of Baltimore City.

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, THOMAS and WORTHINGTON, JJ.

*Edgar H. Gans* and *William S. Thomas* (with whom was *Thomas C. Weeks* on the brief), for the appellants.

*John Hinkley* and *Louis J. Burger*, for the appellees.

BOYD, C. J., delivered the opinion of the Court.

James A. Kerney died in Baltimore in October, 1895, and Emilius A. Sullivan qualified as his administrator in the Orphans' Court of that city. On the 8th of May, 1896, the administrator filed a petition in that Court, alleging that he had filed an inventory of the estate of the decedent of $9,034.70; that Kerney left surviving him as possible claimants and distributees of said estate a widow, "two alleged children," a sister residing in the city of Mullingar, Ireland, and another sister residing in Australia; that questions had arisen among the parties in interest respecting the relationship, if any, which the "two alleged children" bore to the decedent, and that conflicting claims were made in respect to the distribution of the estate. It then alleged that he could not "with safety to himself, nor to the interests of those entitled therto, distribute the said estate of the said decedent without the aid of this Honorable Court," and prayed the Court to pass an order in pursuance of, and in conformity to, Article 93, sec. 143 (now sec. 142), of the Code—suggesting the 10th of July, 1896, as the date of the meeting. The petition was duly sworn to by the administrator, and upon it the Court passed an order, the day it was filed, "that the 10th day of July, 1896, be named and appointed for a meeting in this Court of persons entitled

to distribution, shares or legacies, or a residue of said decedent's estate, in pursuance of the provisions of chapter 255 of the laws of Maryland of 1896," which was the Act above referred to.    It further notified and warned all such persons to be and appear in person, or by guardian, solicitor or agent, in that Court on the day named, "to the end that payment and distribution may be then and there made under the Court's direction and control," and directed publication in one of the daily newspapers published in Baltimore, once a week for four successive weeks before the 10th of July, 1896.    A copy of the order was published in the Daily Record, as required.

Sec. 142 of Art. 93, provides, that "Any administrator or executor shall be entitled to appoint a meeting of persons entitled to distributive shares," etc., on some day to be named and appointed by the Orphans' Court, on petition, and "distribution or payment may be then and there made under the Court's direction and control, subject, however, to such adjournments from time to time as the Court shall deem proper to order."    It then provides for summons being served on residents of the State, and for publication against non-residents and against those whose places of residence are unknown, or when the parties in interest are unknown, or when it is not known whether the person in interest be actually living or dead.    The section concludes, "and distribution and payment as aforesaid made under the direction and control of the Court shall protect and indemnify the administrator or executor acting in obedience to it."

We do not understand that any question has been made as to the petition, order of Court or publication, which seem to have been in compliance with the statute, using substantially its language.    An administration account was settled in the Orphans' Court on August 31st, 1896, and on the same day an agreement was executed between Thomas C. Weeks, attorney in fact of Margaret Kerney, widow, who resided in Chicago, of Kate Dargan, a sister, residing in Ireland, and of John and Elizabeth Hafford, nephew and niece, residing in Ireland, William J. Garrett, attorney in fact of Michael Kerney and Katie Kerney,

residents of Chicago, and described as children of the decedent, and William C. Shelley, attorney in fact of Margaret Sheehan, a sister, residing in Australia, parties of the first part, and Emilius A. Sullivan, administrator, party of the second part, by which it was agreed that, after payment of costs, expenses, &c., the residue should be distributed as therein set out. The distribution agreed upon was one-third to the widow and the rest to be divided into five parts, one of which was to be paid to Kate Dargan, sister, one to John and Elizabeth Hafford, nephew and niece, one each to Michael and Katie, children, and the other to Margaret Sheehan, sister of the deceased.

It is contended by the appellees, and was so decided by a majority of the lower Court, that the distribution was in fact made by the administrator, under the agreement, and not under the direction and control of the Court, as provided by the statute above mentioned. Several questions were raised by the appellants, but in our opinion the one just mentioned is the important and controlling one. On March 12th, 1903, a petition was filed by Annie Burke Kerney and Elizabeth Lynch, both of Ireland, in which they alleged that the former is the widow and the latter the only child of the deceased; that in November, 1871, James A. Kerney deserted them and came to America; that atfer he left them, the wife made various but unsuccessful efforts to discover his whereabouts, but was never able to learn anything about him until very recently, when she was told that her husband had died in Baltimore, in October, 1895. Mr. Sullivan died shortly after he settled the account on August 31st, 1896, and William J. Garrett was appointed administrator *de bonis non*, and settled an account on October 31st, 1896, which included a small amount of money left undistributed by Mr. Sullivan, and a leasehold property which we understand to be the same which had been distributed, but not conveyed, by Mr. Sullivan before his death. The petition prayed that the orders of ratification of the accounts be stricken out, and that the administrators be required to account to the petitioners for the estate coming into their hands.

Mr. Garrett answered the petition, setting up several defenses, among them that the settlement was made under the direction and control of the Court.   Certain testimony was taken in Ireland, exceptions to which were filed, but, as intimated above, we do not deem it necessary to pass on them. The majority of the Court passed an order that the two administration accounts be disallowed in respect to the distribution and that the distribution be set aside; that William J. Garrett, administrator, *d. b. n.*, distribute the personal property which came into his hands as therein directed; and that he forthwith take proceedings to recover from the personal representatives of said Emilius A. Sullivan, the former administrator, or from the surety or sureties upon his bond, the value of the estate improperly distributed by him.   From that order this appeal was taken.

The record presents a peculiar condition of affairs.   Treating the testimony objected to as properly before us, there would seem to be no doubt that Mrs. Annie Kerney was the wife, and Mrs. Lynch the daughter of James A. Kerney, and there is no evidence to show that Mr. and Mrs. Kerney were divorced—the latter testified that no such proceedings were ever instituted by her husband or herself.   Michael and Katie Kerney were children of James A. Kerney, by a woman named O'Neill, as the record speaks of her, who afterwards died.   James A. Kerney and Margaret Kerney lived together in Chicago and Michael and Katie lived with them under the name of O'Neill—supposed by Margaret to be nephew and niece of James.   Whether or not James and Margaret, or James and the O'Neill woman ever went through a marriage ceremony does not appear, but we will assume that Annie Kerney was the lawful wife, and is the widow of James, and that hence he was not lawfully married to either of the other two.   James A. Kerney was a traveling auditor of the B. & O. R. R. Co.; and Mr. Sullivan was in the auditing department of that company, "and was a close personal friend and confident of Mr. Kerney, the deceased," as stated in the testimony of Mr. Garrett, who was counsel for Mr. Sullivan in

the settlement of the estate and succeeded him as administrator. When James A. Kerney died, the supposed widow, Margaret, and the two alleged children, Michael and Katie, came to Baltimore to the funeral, from Chicago. Michael and Katie then stated that they were not nephew and niece but were children of James. The latter had lived in Baltimore with the O'Neill woman, and Michael and Katie were their children—going by the name of Michael and Katie Kerney, but, as we have said, when they went to Chicago to live with Margaret, they went by the name of O'Neill and were supposed to be nephew and niece. The record is not very explicit, but we understand from it that James and Margaret never lived together in Baltimore, but did in Chicago—although apparently Baltimore was regarded as his place of residence at the time of his death.

There is nothing in the record to suggest that Mr. Sullivan or any one in this country knew that Kerney had left a wife and child in Ireland, and, although the petition alleges that the distribution made in the Orphans' Court was the result of a deliberate conspiracy between Mrs. Dargan, Margaret, Michael and Kate Kerney. Mrs. Dargan, whose testimony was taken by the appellees, testified that she did not know until 1901 that Mrs. Annie Kerney was alive in Ireland and had not been in America with the deceased. But when she ascertained the facts she, on the advice of her spiritual adviser, arranged to meet Mrs. Annie Kerney in Dublin, informed her of the death of James, and of the distribution, and gave her one hundred pounds of the money she had received and sixty pounds that her niece, Elizabeth Hafford, had received. The important question therefore is whether the distribution was made under the statute, now sec. 142 of Art. 93 of the Code, or was simply a distribution by the administrator under the agreement.

As we have seen there can be no doubt that regular proceedings were begun in order to have the distribution made under the statute. None of the Judges who heard the case below were on the bench of the Orphans' Court when the

accounts were stated. JUDGE BLOCK, who dissented, was at the time the accounts were stated the auditor of the Orphans' Court, and they are in his handwriting, but his testimony was not taken. The agreement above spoken of between the several attorneys in fact and the administrator, was headed:

"*In re* estate of James A. Kerney, late of Baltimore City, deceased.

In the Orphans' Court of Baltimore City."

After describing the parties, it proceeds "Whereas, After due publication made under the order of this Honorable Court it appears that the parties hereinbefore named and duly represented in this proceeding by their respective attorneys, as aforesaid, are all the personal representatives entitled to participate in the distribution of the estate of the said James A. Kerney, deceased, and for the purpose of avoiding litigation and saving expense in determining their respective rights and interest in said estate the parties hereto have agreed to execute these presents." It concludes by saying, "And the party of the second part" (the administrator) "hereby agrees to distribute the said estate of James A. Kerney, deceased, in conformity to the terms of this agreement, subject to the approval of the Orphans' Court of Baltimore City." On the 27th of August, 1896, the administrator filed a petition in the Court, asking it to allow a fee to the attorney, Mr. Garrett, whom he had employed, and in it states that "as a result of his services, parties, who would otherwise have remained in ignorance of the existence of this estate and of the publication made for non-resident distributees; or would have been too far removed from the jurisdiction of this Honorable Court to have made an effective assertion of their rights in the premises, have been brought into this Court, and their rights have thereby been preserved." That petition states that by his efforts, the attorney "has prevented a long and expensive litigation, which was threatened respecting the rights of certain children of the decedent to participate in the distribution of said estate, * * * and has effected a final agreement between all parties in interest whereby all of said parties are pecuniarily ben-

efited." The Court passed an order allowing a fee of $300, and the administrator was credited with it in the account.

It is difficult to imagine that an administrator, who had taken such care to protect himself, and to ascertain who were entitled to distribution, on the several theories then presented to him, would have deliberately and intentionally ignored the statute, the protection of which he had sought, especially as he was acting under advice of counsel. The agreement which is relied on by the appellees to show that the distribution was not made under the direction and control of the Court shows that all the parties, who, as far as was then known, could obtain any of the estate, considered themselves in Court and did actually appear in Court, through their attorneys, which is expressly authorized by the statute. Indeed the agreement discloses that all of them supposed they were acting in pursuance of the order of the Court, and the administrator gave his consent to the distribution as agreed upon by the parties "*subject to the approval of the Orphans' Court of Baltimore City.*" The account shows that the distribution was "made under and by virtue of agreement made by *all in interest*, and as per said agreement and releases duly filed and recorded in this office." Why was it thought that it was "by all in interest?" Clearly from the fact, in addition to the information they had obtained, that the order of publication had notified and warned all persons entitled to distribution "to appear in person, or by guardian, solicitor or agent," and these persons had appeared by their respective attorneys, and were presumably all who were in any way entitled to the distribution. As the matter then stood, the question was whether the estate should be distributed to the widow and the two alleged children, or to the widow and the two sisters and the nephew and niece. There was no question about Margaret being the widow, and as such entitled to a widow's share, but the only doubt was as to who were entitled to the remainder.

If Michael and Katie were legitimate children of James and Margaret was his lawful widow, as all those in Court apparently believed and had no question about, she would have

been entitled only to one-third, and the two children to the remainder, while if they were not, Margaret would have been entitled to one-half and the sisters and children of a deceased sister of James were entitled to the remainder. As there was apparently no doubt in the minds of any one that every body who could have any interest in the estate was in Court, as a result of the publication under the statute, and of the efforts of the administrator to reach all interested, the only question left for the Court to determine was whether Margaret, Michael and Katie were entitled to the estate, or Margaret and the collateral relations. That would necessarily have involved an expensive, disagreeable and uncertain controversy, and when all who had appeared, as the result of the statutory proceeding and consequently were presumed to be all persons interested, in the absence of some information to the contrary, were willing to settle the controversy in the manner agreed upon, there was no possible reason why the Court could not give its sanction and approval to such settlement, although still acting under the provisions of the statute. The great object of the statute was to provide a method by which all persons interested could receive notice, actual or constructive, of the proposed distribution, and to thus give them an opportunity to assert their claims to the estate, and have the Court determine their rights, instead of casting the burden upon the administrator of making the distribution which the law did, unless he proceeded under the statute. That notice had been published, as required by the statute, and there were not only more than the thirty days between the last publication and the day named for distribution as required by the statute, but it was over seven weeks from that day before the distribution was finally made.

It is manifest that these appellees were in no wise prejudiced by having the distribution made according to the terms of the agreement of the parties, instead of having the Court determine which of the two classes before the Court was entitled to the fund. They were not only not considered, but were not known to be in existence, or, so far as the record discloses,

*ever known to have been* in existence by the administrator, the attorneys in fact or the Court.

This case is as good an illustration of the importance and necessity for some such legislation as this statute, as could be well furnished, and it likewise shows the danger of dealing with proceedings in the Orphans' Court from too technical a standpoint—when the Court has jurisdiction and has substantially complied with all requirements necessary for the exercise and continuance of its jurisdiction. A former resident of Ireland came to this country, obtained a responsible position with one of the large railroad companies here and, after living here for thirty-five years, died leaving one who was apparently his widow and some relatives.   There was nothing to suggest, so far as disclosed, that any one—not even his "close personal friend and confidant"—had any knowledge or suspicion of a lawful wife and child living in Ireland, but on the contrary James lived with a woman in this country as his wife, who presumably was.   Then when a question arose as to those entitled to the remainder, after his supposed widow's portion was set apart, the administrator adopted the method prescribed by our statute to have the rights of the parties judicially determined.   All persons who apparently had any claims upon the estate appeared in Court in response to the statutory notice.   There was no question as to who the collateral relations were, and the only doubt was whether the two, who claimed to be children of the decedent, were such as the law would recognize, and therefore entitled to the distribution after the widow's share was allowed, or whether they were not.   If he left no legitimate children then unquestionably those claiming to be collateral relations were entitled to share in the estate.   But because the parties settled that controversy between themselves, it is contended that distribution and payment were not made "under the direction and control" of the Court, although every thing had *up to that time* been done which was necessary to have the estate so distributed.   After the proceedings had been conducted as far as they were, and the estate subjected to expenses which were

allowed in the account, it would almost be a reflection upon the Court to assume that it would then fail to "protect and indemnify the administrators," as it was authorized to do, and the presumption is that the Judges did their duty. But we do not have to rely upon such presumption alone. A distribution according to the agreement was as much under the direction and control of the Court, within the meaning of this statute, as a distribution to the one set of claimants to the exclusion of the others would have been. The administrator did not attempt to make distribution *independent* of the Court, but, by the very terms of the agreement, *subject to its approval*. It was not an agreement *out of court*, but it was one made as a part of the proceedings *in court*—which proceedings were being taken under the provisions of the statute.

The proper course to pursue was to have a formal order of the Court, showing that the distribution was made "under the direction and control of the Court," but the records show that there was endorsed on the account, "Examined, proved and passed by the Orphans' Court for Baltimore City, on the 31st day of Aug. '96, same day filed and recorded.
Sworn to Aug. 31st, 1896, T. W. M.    Approved, C. F. R."

The testimony explains that the initials "C. F. R." were those of one of the Judges of the Court (Charles F. Riehl). Mr. Garrett testified that after he had made an investigation as to how Mr. Kerney lived in Baltimore with the O'Neill woman, and found that these children were then living with them, and after talking with the widow (Margaret) and finding that she "was a little put out that the children should claim to be children of Mr. Kerney," he told Mr. Sullivan that he would have to write to Ireland, and wheresoever he thought proper, to find out whether there were any collateral relations, "and that the estate would have to be distributed under the direction of the Court *and it could not be distributed otherwise*." He further said, "The agreement was referred to the Court and they nodded their approval of it, and I think the account was made up at that time. It has been so long ago I cannot just remember, but the account was passed by agreement *and approved*

*by the Court.*" And again, "The account was not stated until after the order of publication expired and everybody was in, as we thought, and I believe so now."

Mr. Weeks testified that when the time had expired under the Act of 1896, all of them went into Court and there stated that the agreement had been entered into, and it was agreeable to all parties, and "when I made the proposition that the order of Court should be reduced to writing, one of the Judges said there was no necessity for that, the Court will approve the agreement and it will go on record. I recollect that very distinctly, but which of the Judges said it, I could not say, and the distribution was made and the account stated." The agreement and powers of attorney were recorded in the Orphans' Court, and in addition to the memorandum of passing and proving the account, as above stated, there was a formal order signed by all three of the Judges which directed the administrator to "grant and convey to Michael Kerney and Katie Kerney the chattels real distributed to them by the administration account of the estate of said deceased returned by said admr. and passed by this Court." That account expressly refers to the agreement and a part of the distribution, made in the account, was that of the chattels real to Michael and Katie Kerney.

The only thing lacking, therefore, was a formal order, showing that the distribution was made under the direction and control of the Court, but the endorsement on the account and the order of Court above referred to show that the Court did act on the account, and the proceedings in the record are ample to establish the fact that the Court as well as the administrator and all the parties present, understood that they were acting under the statute. The administrator cannot therefore be held liable merely because the Court did not pass a more formal order, as it was requested to do.

In *Conner* v. *Ogle*, 4 Md. Chan. 450, it was said, in referring to an administrator acting under the statute, as it then existed, "In most cases he would be safe in acting under that direction and control; but he must show that the meeting was duly

appointed, notification of some kind given to the parties interested, and the case presented to, and acted upon by the Court." All that, we think, is shown to have been done. There was no provision in the statute until it was amended by the Act of 1896, as to how notice could be given, but it was often cited by this Court as the method to be pursued to protect an administrator, in the distribution of an estate. See *Shriver* v. *State*, 65 Md. 282; *Hoffman* v. *Hoffman*, 88 Md. 62, and other cases noted in the Code. No question has been raised as to the validity of the statute, and none occurs to us. It is intended to relieve administrators and executors, and their sureties, from the great responsibility resting upon them, if distribution be made by them *in pais*, instead of under the direction and control of the Court. Although our statute was originally passed in 1798 it was of limited use, because it did not provide a method of giving notice to the distributees to appear, and when they were non-residents, or not definitely known, an administrator was often subjected to perils which the amendment of the law was intended to relieve him of, if he complied with it.

We are, then, of the opinion that the distributions in this case were made under the statute, and that the order of the lower court was erroneously passed. If, as appears by the evidence in the record to be the case, the appellees were entitled to the estate of James A. Kerney, it is to be regretted that they were not aware of his death in time to assert their claims, but they have no remedy against the original administrator, or the administrator *de bonis non*, inasmuch as the accounts were stated under the statute. Whether or not they can recover from the distributees is not before us.

Although we do not deem it necessary to pass on the questions raised as to the testimony taken in Ireland, we do not want to be understood as approving of the form used for such depositions, under sec. 17 of Art. 35 of the Code, when taken *ex parte*. No interrogatories were returned or filed with the notary, so far as his return shows, and the Court has no means of knowing whether leading questions were asked, or

how the examination was conducted.   It is certainly a very
dangerous practice, when there is no appearance for one side,
and does not seem to be contemplated by the statute, which
provides that such depositions shall be admissible as evidence
"as if the same had been taken under a commission as pre-
scribed in the preceding section," and to "be treated in all re-
spects as if taken under a commission regularly issued by said
Court and shall be subject to the like exceptions as testimony
taken under commission."   The "preceding section," which
relates to commissions to take testimony out of the State,
requires that "interrogatories be proposed or exhibited."   Of
course, when both sides are represented, they can agree not
to require the interrogatories to be written out, but in the
absence of some agreement, rule of Court or statute regulat-
ing the method of taking testimony, we do not regard that
adopted in this case as safe or desirable.   The depositions as
returned are practically *ex parte* affidavits.   One statement in
the evidence of Mrs. Kerney referred to above—that "no
divorce proceedings were ever instituted by either the deceased
or myself"—shows the danger, as it is not likely that she
meant to make such an unqualified statement, but only to
refer to proceedings of her own knowledge.

The order must be reversed, and the petition of Annie
Burke Kerney and Elizabeth Lynch dismissed.

> *Order reversed and petition dismissed,*
> *the appellees to pay the costs.*