TATIANA V. DECHTEREVA FRANCE *v.* SAFE
DEPOSIT & TRUST COMPANY.
SAFE DEPOSIT & TRUST COMPANY *v.* TATIANA
V. DECHTEREVA FRANCE.

[Nos. 28, 29, 30, 31, January Term, 1939.]

308

*Decided March 8th, 1939.*

The causes were argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, JOHNSON, and DELAPLAINE, JJ.

*Randolph Barton* and *Abram C. Joseph,* with whom were *Daniel C. Joseph* and *Laurie H. Riggs* on the brief, for Tatiana V. Dechtereva France.

*Isaac Lobe Straus,* with whom was *Joshua Clayton* on the brief, for the Safe Deposit & Trust Company.

OFFUTT, J., delivered the opinion of the Court.

This is a suit for an absolute divorce brought by Dr. Joseph I. France, who died pending this appeal, against Tatiana V. Dechtereva France, his wife. It is alleged in the bill that the parties were married on July 27th, 1927, in Paris, France; that they separated on September 21st, 1931; that after that and until the institution of this suit on June 3rd, 1937, they lived separate and apart without any cohabitation between them, and that the separation was voluntary and beyond any reasonable expectation of reconciliation.

The defendant answered, denying that the separation was voluntary or beyond a reasonable expectation of reconciliation, but admitting the other facts alleged in the bill. Testimony was taken, depositions read, the parties heard, and at the conclusion of the hearing the court decreed that the plaintiff be divorced *a vinculo matrimonii* from the defendant. In the course of the proceedings and after that decree the court refused and denied the defendant's motion and petition for permanent alimony. From the decree and from that order the defendant noted the appeals in No. 28 and No. 30 on the Docket of this court for the current term. After the decree the court, on August 26th, 1938, ordered that the plaintiff pay defendant's counsel $2500 for their professional services in her behalf, and on September 29th, 1938, it ordered

that pending the appeal the plaintiff pay the defendant $300 per month as alimony *pendente lite,* and a further fee of $500 to her counsel for services in connection with the appeal. From those orders the plaintiff noted appeals No. 29 and No. 31, on the same Docket. The four appeals are in one record, were argued, and will be considered, together.

The appeal in the principal case presents two important questions, one, what is the true meaning of the word "voluntarily," and the phrase "beyond any reasonable expectation of reconciliation" found in the five year separation provision of Code, art. 16, sec. 38, as amended by chapter 396 of the Acts of 1937, and, two, is the evidence in this case sufficient to support a finding that the separation of the parties was voluntary and beyond any reasonable expectation of reconciliation within that meaning?

In dealing with the second question, weight must be given to the consideration that the plaintiff assumed the burden of proving the allegations of his bill by evidence of the quality and quantity required to support a decree of divorce. 19 *C. J.* 125; 17 *Am. Jur.* 336. The measure of proof required in cases such as this, which involve no question of moral turpitude is, as in ordinary civil cases, a preponderance of the evidence. 17 *Am. Jur.* 336. Nevertheless the preponderance should be patent and definite and not strained or dubious, but if it is clear and definite it is enough even though it leave a residuum of doubt. 19 *C. J.* 125, 144; *Ellett v. Ellett,* 157 N. C. 161, 72 S. E. 861; *Anderson v. Anderson,* 78 W. Va. 118, 88 S. E. 653; 17 *Am. Jur.* 336. Preponderance, as thus used, means that the weight of the evidence, tested by the number and character of the witnesses who give it, the inherent probability of the truth of their testimony, their interest in the issue, their bias, their demeanor on the witness stand, and the manner in which they testified, inclines more heavily to establish the existence or non-existence of facts in respect to which it is offered, than evidence to the contrary. *Words and Phrases,* First, Second, Third, and Fourth Series.

312

In considering the contrasting stories submitted by the parties of the vicissitudes and infelicities of their married life, it is useful to consider briefly their situation at the time of their marriage and separation, their background and their personal characteristics.

Joseph I. France was a widely educated man, and held degrees in letters and in medicine. He graduated from Hamilton College, and in medicine from the College of Physicians and Surgeons in Baltimore, he attended Clark College and Leipzig University, and the Johns Hopkins Medical School, and for a short time practiced medicine in Baltimore.

He came to Port Deposit in Cecil County in 1897, and resided there with occasional absences until his death. At some time, not shown by the record, he married Evelyn S. Tome, with whom he lived until her death on April 22nd, 1927.

He did not practice his profession after 1908, but at that time he appears to have been in the possession of a large fortune, he operated Mt. Ararat Farms near Port Deposit, which he later sold for $150,000, he appears to have been interested in the stock market, he traveled extensively, in later years took an active interest in politics, and was United States Senator from 1917 to 1923.

In 1924, while a visitor in Russia, he met Tatiana V. Dechtereva, the defendant in this case, who was at that time some seventeen or eighteen years of age. She was a daughter of Vladimir Dechtereva and Tatiana Kassathine Restovskaya. When she was sixteen her father, who "was of noble birth," was shot while she was carrying food to him in a Russian prison where he had been placed by the Bolshevik party of Russia, and her life at that time was passed in an atmosphere of bloodshed and terrorism and fear, which appears to have left deep and indelible scars on her mind and spirit, which have not healed.

Her family history showed a predisposition to mental illness, she herself was emotionally unstable, and suffered from time to time from attacks of nervous or mental ill-

ness of varying degrees of severity, characterized by depression, fear, agitation and physical collapse, and in 1937 she suffered from an illness which justified the diagnosis of purpura haemorrhagica, a disease characterized by copious hemorrhages from the mucous membranes.

She had nevertheless a mind of excellent quality. She spoke three languages, Russian, French and English, very well, and had some knowledge of Italian and German, and was occupied at times in the translation of books. She was a devout member of the Russian Catholic Church, and apparently conscientious in her observation of its feast and fast days.

Before her marriage she lived with her mother in Moscow. The family was without means, her mother was employed as an interpreter and translator there for the Moscow correspondent of the Chicago Daily News, and it may be inferred that it was through that connection that she, and through her her daughter, met Dr. France in 1924.

The mother said, and there is no contradiction of her statement, that Dr. France proposed to her daughter in 1924, but for obvious reasons there could have been no marriage then, for his first wife did not die until April 22nd, 1927, about three months before his marriage to the defendant. At that time it may be inferred from Dr. France's testimony that he knew of the mental and physical condition of the woman he married, for he said: "Q. Well then, you had an ample opportunity of knowing of your's wife's physical and mental condition long before you married her? A. I would say not. In a general way I knew of her condition, yes. Q. That's what I say, you knew her some years before you married her, about four years? A. Not so much, no. Q. About three years? A. I think it was about three years Q. So that you had occasion to observe her in those three years before you married her? A. Yes."

They were married first by Harry Chatonet, assistant to the Mayor of Paris, and later according to the rites of the Russion Orthodox Church by Sergius Bulgakov, a

priest of that church. On June 17th, 1927, about ten days before the marriage, the parties executed an ante-nuptial agreement, under which each party waived and released his or her marital rights in the property and estate of the other. At that time it may be noted that she had neither property nor expectations of property, while Dr. France was a very wealthy man. He was then fifty-four years old and she twenty-one.

After a wedding trip of about two months, Dr. France returned to this country, but for some reason she declined to return with him at the time, but he returned something over a month later and brought her and her mother back with him, and she remained with him at their home in Cecil County with occasional absences until August, 1929, when he accompanied her and her mother on a trip to Europe. She returned to their home in June, 1930, and except for temporary absences remained with him until September 21st, 1931.

In April, 1931, she left their home at Port Deposit and went to New York, where she remained with her mother for a period which Dr. France at one time said was three months, at another two months. The evidence concerning the circumstances of that separation is conflicting. Mrs. France said that she went to New York to attend her church in Russian Easter Season, that Dr. France had "always allowed" her to do that. He said that she went to New York for a week's visit, and declined to return. She said that while she was in New York, Dr. France came to New York, and:

"He was jealous. He called me on the telephone and he rushed in. He came to New York. He called me on the telephone, started a scene, a violent scene. It was a holiday in the church at night, he called me and asked me. He was just jealous as he used to be many times. So the next day he rushed up all excited and at once he started a very bad scene, that's what I call a bad temper, a fit of temper, so he accused me of staying in New York all by myself because I needed a suit, and said that I have no right for anything, which I refused all my rights that I

shall die in the streets and then after that he left the room. Q. Then he said you have no rights under the ante-nuptial agreement and he said you would be on the streets? A. Yes. Q. Did he say you will hear from my attorney? A. Yes, he left the room saying 'you will hear from my attorneys,' and he left the room saying, 'You will hear from my attorneys.' Q. Your church as I understand it, was in New York? A. Yes. Q. That's how you got there? A. Yes."

She added that he said she was spending too much money, that he objected to her purchase of a blue suit, and that he accused her "of different things, just shouting," that she stayed on for several days with her mother, and that Dr. France called her mother on the telephone and wanted to know "Why are you staying so long?" She also testified that she was frightened by the threats, and went to Baltimore to see a lawyer to see "what this meant, what was this pre-nuptial contract and why I had no rights."

She did see a lawyer, Matthew Gault. Later the parties were reconciled and she returned to Port Deposit. Explaining her visit to Mr. Gault, she said: "There was never a suit for divorce. I was frightened by continuous threats. I asked the lawyer what continuous threats about I had no rights, I asked his advice, what was the situation and then I didn't know what was the nuptial contract because I didn't understand what I was signing, and then I asked what was the situation, what did the pre-nuptial contract mean, what was the situation that he could threaten to me, she would be left in the streets." Dr. France denied that there was any quarrel in New York, and speaking of the reconciliation in Baltimore, he said: "You said that she employed a lawyer and that she discovered her mistake and came back. Didn't you come and get her in Baltimore? A. She employed a lawyer and threatened to bring suit for divorce. Shortly after I had announced myself as a candidate in the Republican Presidential Primaries. You may draw your own conclusions about that."

Dr. France's testimony concerning the final separation of the parties is meagre and unsatisfactory. He was asked, "What did you know about her leaving and about her purpose of going abroad; what information did you have of that?" and he replied, "No information except that she wanted to go, I presume." Later he said that the separation "was voluntary. I didn't wish her to go but she was unhappy, and I consented to her going and supporting her while in Europe, showing that it was voluntary on my part, and she remained away, showing it was voluntary on her part." It appeared from his testimony, however, that he accompanied her to New York, that he stayed at the Pennsylvania Hotel with her overnight, that he bought the steamship tickets for her and her mother, and that he accompanied them to the boat. When asked whether she was in good health, he said that physically she was well, "Nervously she was not well." He was then asked "Didn't you say that because she was nervous that she could go with her mother for a trip to Europe?" and he replied, "She had said that she was miserable and unhappy on the farm, and therefore I consented." He also said that he had told her before she left on that occasion that the separation would be final. But when asked when he made that statement, answered that it was in August. Referring to that separation, he gave this testimony: "Did you have any understanding with her when she left; was she supposed to—did you say how long she was to stay? A. I presumed it was permanently."

Mrs. France gave an entirely different version of the separation. She said that after she returned to the farm in the summer of 1931 she found Dr. France engaged in a campaign to secure his nomination as the candidate of the Republican party for President of the United States; that during her stay Senator Bourne and his wife visited them, and apparently while they were there news came that her sister, who was ill in Rome, had attempted suicide by jumping into the river Tiber, and was seriously injured, and that in consequence her mother de-

cided to go to her, that Dr. France told her to go with her mother, and that Mrs. Bourne spoke to her "very much about going with my mother because Dr. France had to devote all his time to his political activity. He said he would be freer without me." She was then asked whether Dr. France had said how long she was to stay, and she answered "until the issue of the campaign, until he was nominated." Describing their parting on the boat Mrs. France testified: "Did Senator France go to the boat with you? A. Of course he did, and he went down to see me in a taxi. I offered him to stay. If he forgets, I remember it too well. I don't forget. Q. Did he wish at any time anything except that after the campaign was over you were to return? A. Oh, that I was to return after the issue of his campaign was over. Q. It was an affectionate farewell? A. Yes, very affectionate. I was crying."

Mrs. Tatiana N. (or K.) Dechtereva, Mrs. France's mother, asked whether Dr. France had said anything about his wife's return from the visit to her sister, testified: "What were the dates? A. He was saying in January she might return because then he will be through with the very busy part of his campaign and be able to take care of her in the fall. Q. Was that your understanding, that you and she would come back within the year? A. No, not I. I begged him to let me stay longer in Italy. I understood my daughter had two broken legs."

Dr. France had been asked on cross-examination whether, prior to the departure of his wife and his mother-in-law for Italy, he had not written a letter to the Italian consul asking for a visa to permit the return of his mother-in-law to this country. For some reason not apparent in the record the offer of the letter was overruled. Mrs. France's mother had been a guest of Dr. France and her daughter, and since it was improbable that she would have returned to his home if he and her daughter had permanently separated, the letter was inconsistent with his statement that the separation was permanent and voluntary, and it should have have been

admitted. In it, referring to Mrs. Dechtereva, he said: "She will not renew her Russian Soviet Passport but will travel under an affidavit, stating that her passport has expired and as she will become a citizen of the United States, she will not apply for another Russian Passport. Together with her affidavit, as to her not having a passport, she will also have a re-entry permit allowing her to return to the United States, as she was admitted under the preferred quota, and has taken steps toward securing her Citizenship in the United States."

Mrs. France remained in Italy until the following spring or summer, when she removed to Paris, where she remained until she came to this country as a defendant in this suit. In May, 1932, referring to Mrs. Dechtereva, Dr. France cabled Mrs. France: "Mothers visa approved severe winter here Congress Hotel Chicago March fifteenth New York Twenty First."

Mrs. France testified that while she was in Italy she had a cable from her husband which she said was very bad and brutal, that he "wanted to divorce me," nevertheless from that time until after the institution of this suit there was an extensive and voluminous correspondence by letter, cable and telephone between the parties. Without attempting any extended analysis of this correspondence, it may be said that it is characterized throughout by these constantly recurring and persistent notes which are quite inconsistent with the idea that when Mrs. France left her home in Port Deposit she did not intend to return.

Throughout the whole correspondence Dr. France expresses again and again his undying love for his wife, his consciousness of an obligation to support her, his loneliness without her, his sympathy for her in her illness, and his desire for her return; for instance as late as March 20th, 1937, he cabled her: "Love and adore you believe I can make you well come visit me as your Doctor friend am trying telephone you Monday Love to All Answer." Notwithstanding these protestations of love, there recurs again and again in his messages a suggestion

for divorce, beginning shortly after his wife went to Italy and continuing until his letter of March 30th, 1937, when he wrote: "I believe, unless you wish to come back, that for the sake of both of us we should be divorced." On the other hand, such testimony as there is indicates that Mrs. France was also devoted to her husband and desired to live her life with him. In a letter to her dated February 9th, 1933, quoting apparently from a letter to him from her, he wrote: "I take your words: 'Tell me that you will care for me, not forsake me.' These words reveal the very deep cause of your trouble. No woman ever needed security and protection more than you. When I made you my wife, became your husband I took upon myself, the duty of caring for you. It was a joy also. I can do nothing for you now, since I could not make you happy, but take care of you. That I shall do. I can not promise you great wealth but I can promise you that you are secure and protected by my financial care for you. That is my work, my *first* work and duty while I live and my will provides for you after I am gone. So, on the material side, you may feel secure, protected as my wife. But, more than this you may feel that you are protected by my love for you." Then on July 9th, 1937, he cabled: "Thanks beautiful letter all understood forgiven not hate love much gratitude your kindness write often no reproaches I suffered I take your advice against divorce worry no more Tania France love adore you happy you remain wife forever tell father my reverence affection also I planned no remarriage ask him pray for me you need not come if ill see Cunard surrender Saturday reservation if not coming your letter gave peace believe every hour you absent miss answer quick tender love forgive me."

Mrs. France testified without contradiction that in March, 1937, Dr. France had a conversation with her over the long distance telephone from this country to France, which she thus described: "Dr. France tells me this—he cabled me before that I should come to America and when he telephoned he said, 'You need not come, you

are too ill now.' He answered me, 'How are you? Is it difficult for you to speak? Take care of yourself. Take care of mother.' I told him, 'I miss you always.' He answered me, 'You are a sweet girl.' I begged him and implored him to come to me, that I was very ill and lonely, that I missed him and I need you, and he said, 'I cannot come to you because I am making some money on the market exchange,' and I begged him to come and be with me, and at last he said, 'I may come later to you' but instead of doing that he started these proceedings." She also made this reference to another telephone conversation on June 23rd, 1937: " 'Do not worry. Do not do a thing. Wait for my letter. I have written you many letters. I have not sent them.' I told him, 'I miss you. I want to see you,' and he ordered me very sharply, I said, 'I miss you.' He ordered me very sharply and unpleasant. Q. So he asked you not to do anything about the divorce? A. Yes, 'Do not worry, do not do a thing. Wait for my letter,' which never came. He wanted me to wait and not to do a thing."

In sharp contrast with Dr. France's professions of affections in his correspondence with his wife, were his actions and his statements to others. His wife was without funds or resources except such as he furnished, and throughout her stay in Italy and in France, she appears to have been so ill that she was unable to travel alone. He made her a substantial allowance for her living expenses there, but he failed to send her funds for the expenses of a trip to their home in Maryland, and when she had an opportunity to come back with the Rev. Father Sergius Bulgakov, her friend from childhood, and so cabled him, he neither answered nor sent money for the necessary expenses of the trip. Mrs. Helen A. Shenitz, a friend of Father Bulgakov, testified that on the occasion of a visit of Father Bulgakov to her home in 1934 Dr. France came there to see him. That he again visited her in 1936 and that on that occasion said that he wanted a divorce, that he wanted to marry another woman, and that still later he called again and the following conversa-

tion took place between him and Father Bulgakov: "First he talked to Father Sergius about the same subject, but then I talked to him exactly three hours about bringing his wife here, I begged him, I wanted him to understand the situation, how miserable was Mrs. France, how sick she was. I was exhausted trying to make him believe the necessity of bringing his wife here. His answer was always no, no, and no. Finally when he said he cannot at present, I said all right, practically, 'Senator, how about my furnishing the money to bring your wife here?' He said, 'No, I couldn't consider this'."

The testimony of Father Bulgakov, together with that of Dr. Julia Rentchitsky, Dr. Albert Capmas, Dr. Serge Ilnitzky, Dr. Kabaret Agadjaniantz and Dr. Maxime Lipschitz, was taken in Paris, France, before John R. Wood, vice consul of the United States, apparently under the supposed authority of Code, art. 35, secs. 16 to 18 inclusive. The plaintiff objected to the admission of the depositions, but his objection was over-ruled. There was no discussion, oral or written, in this court, on the part of the appellant, of those rulings, nor does a copy of the notice appear in the record. But it is apparent, from an examination of the docket entries and proceedings, that the depositions were taken under the provisions of article 35, sections 16 to 18. That a notice of some kind was served is conceded, and it will be presumed, in the absence of a showing to the contrary, that the trial court ruled correctly (3 *Am. Jur.* 489 *et seq.*), and that the proceedings were formal and regular.

The general rule is that a party who has not appealed may not assign error (3 *Am. Jur.* 403; *Benson v. Atwood,* 13 Md. 20), but the rule in this court is that, since in appeals in equity it must weigh and consider the evidence as a court of chancery would do, all rulings in respect to it, whether adverse to the appellee or appellant, must be considered. *Tillinghast v. Lamp,* 168 Md. 34, 41, 176 A. 629; Code, art. 16, sec. 279.

It does appear that the depositions were taken before a vice consul in Paris, and it was admitted that the notice

informed the plaintiff, on or about January 6th, 1938, that the testimony would be taken in Paris on January 12th, six days later, and that on January 10th, 1938, he filed objections to the taking of those depositions.

Upon that showing two objections may be considered, one, that the vice consul was not an officer authorized by the statute to take depositions, the other that the statute does not apply to depositions taken beyond the seas. The obvious meaning and intent of the statute is that the depositions should be taken before some officer having by virtue of his office authority to administer oaths and examine witnesses. A vice consul is such an officer (U. S. Code Ann., title 22, sec. 131) and came within the class authorized by the statute to take depositions.

The second objection is also untenable. It is based on the theory that the statute does not afford the adverse party sufficient opportunity to be present when the depositions are taken. But that objection goes rather to the administration of the statute than to the statute itself. If the time named in the notice is too short to enable a party desiring to do so to attend when the depositions are taken, he can by reasonable application to the court have the time extended. The same statute was considered by the court in *Garrett v. Kerney*, 107 Md. 501, 513, 68 A. 1051, in connection with depositions taken in Ireland, but while the court there criticised the failure of the party offering the depositions to file interrogatories, it did not question the validity of the statute, or the right of a party to take depositions, under its authority, beyond the seas. Although there was ample opportunity, there was in this case no request by the plaintiff to have the time of taking the depositions extended, and they may properly be considered in this case.

Returning to the narrative, Father Bulgakov stated in his deposition that he visited America in 1934 and 1936 to lecture and to attend a convocation of the Protestant Episcopal Church at the request of its presiding bishop. On these visits he met Dr. France, at one time as a guest at Port Deposit, at another in New York at the home of

Mrs. Shenitz. He said that he was Mrs. France's confessor, that his relations with Dr. France were "good enough," that he had a long intimate talk with him about "the situation of his family" and that "I did all possible to convince him that it was necessary to come to Europe and fetch her personally. Q. To come for Mrs. France and to take her back himself? A. Yes, because she was not able to go alone. This conversation was very long and intimate; but I had no success, his opinion was that there was nothing to be done."

The reasons given by Mrs. France for her failure to return to her home after she left it for Italy in 1931 were that she had no money and that she was too ill to travel alone. It is certain that after her return and until the trial she was constantly under the care of physicians. Dr. Irving J. Speer, a psychiatrist of wide experience, testified that he examined her in late November, 1937, and found her physically ill, undernourished, suffering from a secondary anemia, and affected by an agitated apprehensive depression, with suicidal tendencies and in need of hospitalization. In October, 1937, Adolph Meyer, a distinguished specialist in mental and nervous diseases, wrote: "Mrs. France had a serious, probably schizophrenic, mental disorder in 1922 and another attack in 1932, which has left her in this invalidism and particularly a residual in the morning hours that incapacitates her and aggravates greatly the main distress, that of a state and fear of lonesomeness. It might be well to give her an opportunity of hospital residence if her co-operation can be obtained."

On December 4th, 1937, she was admitted to the University of Maryland Hospital. While there her mental condition improved, but she failed to improve physically, which Dr. Speer said involved the possibility of a mental relapse. When asked whether it was possible for her to have traveled from Europe to America alone since 1932, the same witness said: "At this time she is neither mentally nor physically qualified to travel alone. She is unable to travel alone. Based on the history from her and

mother, and certificates presented to me, I should say, from 1932 on to the present time, it was impossible for her to travel alone, and, at times, most inadvisable to travel unaccompanied."

The testimony of Dr. Speer as to Mrs. France's mental and physical condition when he examined her was supplemented by the depositions of Doctors Rentchitsky, Campas, Ilnitzky, Agadjaniantz and Lipschitz, who attended her in Paris at different times during her stay there from 1932 until she returned to this country for the trial. The substance of their evidence was that during that period Mrs. France was physically and mentally ill, that she was depressed, subject to suicidal impulses, and that it would have been unsafe for her to travel alone.

Following the testimony of Dr. Speer, Dr. France testified as an expert witness on his own behalf. He stated that a physician in Moscow had diagnosed her mental condition as dementia praecox, but that he disagreed with that diagnosis as well as with the diagnosis of Dr. Speer, that in his opinion in "addition to her neurotic heredity and introversion, Mrs. France had, what my brother has overlooked, hyperthyrea, and excess secretion of the thyroid gland, symptoms of which are a fear psychosis, emaciation, sweating, diarrhea, anxiety, and, at times, excitement. The disease is characterized principally by a rapid heart. All of these symptoms my brother has testified to." The thyroid condition he described as Grave's disease. He added later: "Her recovery is not pertinent to this case, but in June, 1930, or rather in May, 1930, she was in Europe, had been away for six months, and signified her desire to return. I have had some experience in traveling. I know very well that I can place any patient, maniacal, demented or paralyzed, in the hands of the Cunard Line, and have them safely transported to this country," and said that he had arranged for her transportation. But it was not disputed that he neither sent her the money for her passage nor paid the Cunard Company for it.

Dr. Speer, recalled, said that when Mrs. France was ad-

mitted to the hospital a complete mental and physical examination showed no trace of Grave's disease, nor any evidence of a hyperthyroidal condition, and that at that time she was not affected by schizophrenia, although she had probably had it in the past.

Code, art. 16, sec. 38, in part provides: "Upon a hearing of any bill for a divorce, the court may decree a divorce *a vinculo matrimonii* for the following causes, to wit: * * * when the husband and wife shall have voluntarily lived separate and apart, without any cohabitation, for five consecutive years prior to the filing of the bill of complaint, and such separation is beyond any reasonable expectation of reconciliation." Acts 1937, ch. 396. The question in this appeal is whether the facts stated show that separation of the parties was voluntary for five consecutive years, and is beyond any reasonable hope of reconciliation within the meaning of that statute. The statute was considered by this court for the first time in *Campbell v. Campbell,* 174 Md. 229, 198 A. 414. In that case the parties had lived separate and apart for twelve years under an agreement which both had executed. It was held that under those circumstances their separation was voluntary. In the course of that opinon, the court said: "The important question of fact in this case is whether the separation of the parties has been voluntary. Unless it should be so characterized, the plaintiff is not entitled to a divorce under the Act of 1937, which the suit invokes." As used in the Act and construed in that opinion, a voluntary separation is a physical separation of the parties, by common consent with a common intent not to resume marital relations. It does not mean a mere physical separation where one of the spouses for business or pleasure leaves the other, intending to return, and with no intention of affecting their marital relationship. Any other construction would mean that whenever a wife took her children to a summer resort, or a husband went on a business trip, there would be a "voluntary" separation within the meaning of the Act, which is manifestly absurd. On the other hand the voluntary

separation may begin at any time, contemporaneously with, or during, the physical separation. So that a separation may be voluntary at the inception of the physical separation and remain so throughout the required period. Or it may begin at any time after the physical separation, when the parties manifest agreement in a common intent of not living together again, but in that case it must continue without interruption for five years from the time of the agreement, before either spouse is entitled to a divorce under the statute.

It is suggested that an "agreement" is not a necessary ingredient of a "voluntary separation." But the very word "voluntary" connotes an agreement. Unless the parties agree to live apart the separation cannot be voluntary. It would hardly be contended that if one spouse is confined in a hospital as a helpless invalid that the separation is voluntary. The word implies volition, willingness, intent, when used in reference to the act of an individual it signifies that he acted of his own free will, when used in respect to the common act of two or more persons which terminates, continues, or otherwise affects their common relationship, it can only mean that they acted in common and willing concert in the doing of that act. *Bain v. Bain,* Tex. Civ. App., 252 S. W. 252; *Anonymous,* 206 Ala. 295, 89 So. 462; *State v. Dist. Court,* 137 Minn. 283, 163 N. W. 509; *Partee v. Memphis Concrete Pipe Co.,* 155 Tenn 441, 295 S. W. 68; *Jakubke v. Jakubke,* 125 Wis. 635, 104 N. W. 704, 705; *Sanders v. Sanders,* 135 Wis. 613, 116 N. W. 176.

Where a relationship exists between two persons by reason of their common consent, it can only be voluntarily terminated by both, when both are willing and intend that it be terminated. If one of his own free will and accord ends the relationship against the will and wish of the other, the termination is voluntary as to the one, involuntary as to the other.

In this case it is apparent from the whole record that, whatever the undisclosed intention of Dr. France may have been, when Mrs. France left his home on Septem-

ber 1st, 1931, she did not intend the separation to be permanent, nor did she know or intend that it would affect her marital relations with him. It is possible that he intended it to be permanent, because no one knew better than he did of her mental and physical condition and of her destitution, and that once she was beyond the seas, that because of her health and destitution her return would be doubtful and uncertain unless he made it possible by supplying her the funds and the attention without which she could not return. But his actions gave no hint of such a purpose, and she should not be condemned because she assumed that he spoke and acted in good faith.

When she returned from a visit to Europe in 1930, he must have realized her inability to travel alone, for he said that on that occasion he arranged for "special "stewardesses" and for "special attention of a surgeon," equal to the care she would have had in the University of Maryland Hospital. Before she left in 1931 he had himself taken her to the Johns Hopkins Hospital, where she remained for two months under the observation of Doctor Thayer and Doctor Adolph Meyer. He knew her several years before he married her, knew her so well that he disputed the correctness of the diagnosis of a physician in Moscow who was, he said, an "eminent specialist," that she had suffered from dementia praecox, and gave as his opinion that she suffered from hyperthyrea, induced by the shock of her father's execution. Notwithstanding the extravagant emotionalism of his protestations of love for her, he apparently doubted at the beginning that their union would be permanent, for even then, with a frugal foresight more consistent with business than romance, he required this destitute Russian girl, sick mentally and frail physically, to waive all rights which as a wife she would have in his estate. And that doubt was consistent with common experience. When he first met her, and according to her mother's story proposed to her, he was about fifty-one years old and she about eighteen, when they were married three years later he was fifty-four and

she twenty-one. In the meantime he had seen little of her, their backgrounds were wholly different, their religions were different, but, notwithstanding the disparity in their ages, they had in common certain intellectual and cultural interests, and mutual tolerance and forebearance might have made a reasonably happy union possible.

And indeed their relationship while they were together seemed pleasant enough. He appeared to have been affectionate, indulgent, and generous in his allowances. He was kind and generous to her mother and to her invalid sister, who was affected with schizophrenia, he took pride in her literary ability, and she on her part professed a genuine affection for him, which may have been honest enough, at any rate it did not appear to have been tainted with commercialism or affected by interest in any other man.

But her continuing mental and physical infirmity, the exacting and expensive demands occasioned by her illness, were undoubtedly wearing, and he apparently welcomed her visit to her sister in Italy as an opportunity for escaping what had come to be to him a burdensome relation. That she failed to realize that he intended the separation to be permanent was not unnatural. The visit itself under the circumstances was not evidence of any intention on her part to leave her husband permanently, but was the indulgence of a normal impulse to visit a sick sister who had broken both legs in an attempt to commit suicide. Dr. France said that she suggested that she go to Europe, but he is not corroborated and she contradicted him, and said that he told her to go with her mother, who was a guest at her home at the time, and return in the spring. When she left, Dr. France himself went to New York with her and her mother, made all arrangements for the trip, stayed overnight at the same hotel with her, and accompanied her to the boat. He said nothing at that time to notify her that he did not expect her to return. After she had gone their correspondence was affectionate, continuous, and expensive. He exhorted her to be sure of his love, and expressed the deepest suffering and pain be-

cause of their separation, but he did nothing about it, and there is in his correspondence a recurring suggestion of divorce. He did indeed urge her to return, but he knew that in her state of health she could not travel alone, and that without funds for the trip she could not travel at all, but while he was willing to and did support her in Europe, he neither gave her the money to return nor did he arrange for her passage, and even when she wanted to return with Father Bulgakov, he refused to consent to her return or to give her the money needed for the passage.

On the other hand, the evidence definitely shows that when she left she had no idea that the separation was to be permanent, but expected to return, that she did not learn until she was in Europe that he intended that result, that she repeatedly and in good faith expressed a wish to return, and a willingness to resume their marital relations, and that friends even importuned him to allow her to return.

Upon these facts it cannot be said that the separation of the parties was voluntary in its inception or its continuance, nor, if any weight at all is to be given to his expressions, can it be said that it was without a reasonable expectation of reconciliation. The bill of complaint should therefore be dismissed.

In view of that conclusion the question of permanent alimony presented by the appeal in No. 30 on the Docket for this term becomes moot, and will be dismissed.

The questions presented by the appeals in No. 29 and No. 31, on the same Docket, concern the propriety of certain allowances of counsel fees and alimony.

On August 26th, 1938, the court passed an order directing the plaintiff to pay the counsel for the defendant $2500 as a counsel fee, and from that order plaintiff noted the appeal in No. 29, on the Docket of this court, for the current term. The record in the cases contains 280 printed pages, the proceedings extended over a period of more than a year, the case was not without importance, the judge who passed the order was a careful, able, and

experienced official, familiar with the services of counsel throughout the case, the fee was certified as reasonable by two respectable lawyers, the services involved a number of hearings and interviews both here and abroad, there was no evidence that it was unreasonable, nor was there any formal objection in the lower court to its allowance. Under these circumstances this court would not be justified in reversing the order as unreasonable, or as an abuse of the discretion reposed in the chancellor. Reference is made by appellee to a number of cases in which lower allowances have been reduced, but these cases are not to be taken as binding precedents limiting the discretion of the court with the force of a statute, but as guides to direct it and aid it to reach a just result. The amount of the fee cannot be wholly dissociated from the financial resources of the party charged, because while a fee cannot properly be based upon the financial ability of the client, nevertheless a fair value of the services according to the ordinary factors of labor, skill, time, and benefit, may result in a fee which would be trivial to one client and a crushing burden to another. *Silverberg v. Silverberg*, 148 Md. 682, 130 A. 325; *Bonwit v. Bonwit*, 169 Md. 189, 181 A. 237; *Code of Ethics, Am. Bar Asn.*, Canon 12. The order appealed from in No. 29 will therefore be affirmed.

Mrs. France remained in the hospital of the University of Maryland until May, 1938. Her allowance from Dr. France proved inadequate to meet the hospital charges and medical fees, she was then indebted both to the hospital and to Dr. Speer, and it became necessary for her to go elsewhere. In September following the decree of divorce and her appeal therefrom, she filed a petition for the allowance of $300 a month as alimony *pendente lite* pending the appeal. At a hearing on that petition, on November 4th, she testified that she was destitute, that the alimony for September and October had not been paid, that she had sold off her jewelry including her wedding ring, that she was then living with some "kind ladies" in New Windsor, but that because she was "espe-

cially troublesome" they had asked her to leave, that her physician had told her mother that it was unsafe for her to remain in that home without proper care, and she desired to go to the Brentwood Sanitarium, that she still owed the hospital and her physician, and that she was without funds to pay her lawyers for services in connection with the appeal. On that showing an order was passed allowing $300 a month as alimony *pendente lite,* and a fee of $500 for her counsel. Reference to the many cases decided in this court where the allowance of alimony *pendente lite* has been considered and discussed would not be helpful. Such legal principles as are involved in the question are too plain and well settled to need either support or elucidation. It is undisputed that she was entitled to some allowance, and it was shown without contradiction that she was destitute and in need of institutional care and treatment. She was confronted with the alternative of securing that service as a public charge, or as a private patient, and it cannot be said that upon the facts the allowance was excessive. Dr. France had been paying her $250 a month for years, and in view of her health and needs and the plaintiff's resources, the allowance of $50 a month over that sum was apparently not so unreasonable as to justify this court in setting it aside, and so much of that order as allows the sum of $300 a month as alimony *pendente lite* will not be disturbed.

It is felt, however, that the allowance of $500 to her counsel for services in connection with the appeal was erroneous. This court was reluctant to set aside the allowance of $2500 to defendant's counsel, for the reasons suggested in the consideration of that question. But that allowance was ample compensation for all their services connected with the case, including the preparation of the briefs, examination of the record, and the appearance and argument in this court. So much of the order in No. 31 as allows counsel an additonal fee of $500 will therefore be reversed.

Assuming that plaintiff's exceptions to the testimony may be considered, an examination of the record reveals no erroneous rulings which could affect the conclusions announced, and it becomes for that reason unnecessary to discuss or otherwise deal with them in this opinion.

> *Decree in No. 28 reversed and bill dismissed, appeal in No. 30 dismissed, order in No. 29 affirmed, order in No. 31 reversed in part and affirmed in part, with costs in all the appeals to the appellant in No. 28.*