## SAMANTHA BROWN NICHOLS *v.* ALBERT NICHOLS

[No. 2, January Term, 1943.]

*Decided February 12, 1943.*

The cause was argued before SLOAN, DELAPLAINE, COLLINS, MARBURY, GRASON, and MELVIN, JJ.

*Jerome A. Loughran* for the appellant.

*F. Neal Parke* for the appellee.

MELVIN, J., delivered the opinion of the Court.

This is a suit for divorce *a vinculo matrimonii* under the provisions of the so-called "Five Years Voluntary Separation Act" (Chapter 396, Acts 1937, Code, 1939, Art. 16, Sec. 40). The basic allegation of the bill of complaint filed by the husband (appellee) is in the words of the statute, as follows: That the plaintiff and the defendant "have voluntarily lived separate and apart, without any cohabitation, for more than five consecutive years prior to the filing of this bill, and such separation is beyond any reasonable expectation of reconciliation."

The wife (appellant) answered the bill, denying this allegation and averring that, on the contrary, the plaintiff abandoned and deserted her on October 18, 1936. The answer also contains a petition for alimony *pendente lite*, permanent alimony and counsel fee, but these questions were not submitted for an order and the final decree is silent as to alimony. It does include the allowance of a counsel fee of $35 for defendant's solicitor. This appeal is from the decree granting the plaintiff a divorce, as prayed.

The issue arising directly from the record in this case is whether or not the separation of these parties was mutually voluntary in its inception and continued as such for "five consecutive years," there being no dispute in the testimony that the separation is "beyond any reasonable expectation of reconciliation."

Since the passage of the Act in 1937, exactly five cases under its provisions have been passed upon by this court, in all of which a definition has been either given or reaffirmed of the word "voluntarily," within the meaning of the Act. These cases are, in order: *Campbell, v. Campbell,* 174 Md. 229, 198 A. 414, 116 *A. L. R.* 939; *France v. Safe Deposit & Trust Co.,* 176 Md. 306, 4 A. 2d 717; *Miller v. Miller,* 178 Md. 12, 11 A. 2d 630; *Kline v. Kline,* 179 Md. 10, 16 A. 2d 924; *Beck v. Beck,* 180 Md. 321, 24 A. 2d 295.

The definition as thus given is that the separation must be "mutually voluntary" and based upon an "agreement," for, as stated in the France case, *supra,* the word "voluntary" connotes an "agreement." This was reaffirmed in the recent Beck case, *supra,* and likewise in the preceding Kline case, in which the definition is paraphrased in these words: "In order that a separation of husband and wife can be regarded as voluntary within the meaning of the statute (Chapter 396, Acts of 1937, making voluntary separation for five years ground for divorce), there must be an agreement of the parties to live apart. "The word 'voluntary' signifies willingness. When used in reference to an act of an individual, it means that he acted of his own free will; when used in reference to a common act of two or more persons affecting their common relationship, it means that they acted in willing concert in the doing of the act.'"

The law applicable to this case is, therefore, clear and well defined. It is, in brief, that in order to entitle the plaintiff here to a divorce on this particular statutory ground, he must prove that the separation between him and the defendant, which took place on October 18, 1936, was mutually voluntary as of that date.

To meet this burden of proof the plaintiff proceeded in his own testimony to base his whole case on an alleged agreement with the defendant on June 15, 1936, and not on what happened on the day of his departure in Octo-

ber of that year. The test is, however, whether the separation was mutually voluntary at the time it occurred.

In considering this case it is to be noted that the principals are an aged couple who were about seventy years old when they were married in September, 1933. At that time the plaintiff was a widower with eight adult children living, and she was a spinster. It was not long before their incompatibility became manifest and there was much "unpleasantness" between them. The first step toward a separation was taken in June, 1936, when, according to the husband, he suggested it. When asked by his counsel "Before you separated, did you have any talk about separating," he answered "Yes, it was June 15th." The plaintiff then proceeded to detail an alleged conversation between him and the defendant, in which he testified: "And I suggested, well, if you want to go back to Montgomery County, suppose we separate and you can go your way and I go mine, and she thought it would be all right."

"Q. What did she say to that? A. She said 'all right,' and I said 'well, what do you want to do?,' and she said, 'I can go in the old ladies home, if I can get in.' She didn't know whether she could get in, at that time, and I suggested that we live together for a couple of months, and eventually, by that time, perhaps she could get in, and that would bring it up to August 15th.

"Q. When she married you, did she have a home in Montgomery County? A. Yes.

"Q. I believe she sold that? A. She sold that.

"Q. While she was married to you? A. Yes.

"Q. On August 15th, what happened? A. On August 15th I asked her if she had any chance of getting in the old woman's home, and she never did give me any answer—never said yes or no, and I rather insisted on an answer, and she wouldn't say anything about it. That was her stand. On most of the questions I asked her in reference to herself, she never did give me any answer.

"Q. After August 15th, 1936, what happened? A. Well, on August 15th, after she wouldn't give me any answer, I said, 'Well, we will continue on for a couple more months and maybe you can know what you want to do at that time—what you can do'."

The plaintiff's testimony further shows that he then proceeded to make preparations of his own to leave, anyhow, in "a couple of months." This brought his deadline for leaving up to the middle of October, and every step that he took was based on the alleged agreement made with the defendant on June 15, 1936, which was, as he stated, a conditional agreement. This condition was that the wife could get in an old woman's home, which admittedly she had not been able to do by October 18, or any subsequent date.

The plaintiff must, therefore, look to some other source to establish an agreement on the part of the defendant to the separation which took place on October 18, 1936. That is to say, he must prove that she was in "willing concert" with him in his act of leaving her at that time. The picture of facts presented by the record in this case, as of the day in question, is not one to commend itself to a court of equity at the suit of the plaintiff.

This picture shows an elderly wife left alone and practically destitute by her husband, without any provision whatever having been made for her future maintenance. Insofar as he was concerned, his departure was but the consummation of a prepared program, announced by him several months prior thereto and based on the condition that the wife could get in an old woman's home. It is uncontradicted in the record that he told her in August he was going to leave in the middle of October, even though he could get no answer from her, he said, as to whether or not she had been able to arrange for admission to an old woman's home, or anywhere else. Then again, in October, just a few days before he left, his testimony is that he had made preparations to separate. When the day of departure came he had completed these

preparations and had sent for two of his married daughters to come for him. He gave her no money when he left, and when asked by his wife's counsel: "How did you expect her to live," he replied, "I expected her to go to an old woman's home after she said she was going to do it,"—knowing that even that place of refuge was not available to her.

When the husband moved out on that day the record shows that he abandoned his wife in the literal sense of that word, leaving her there alone, her future unprovided for, and with only a scant supply of fuel and bare necessities—all this without even inquiring what was to become of her after he left. It was in that condition that the defendant's cousin, Miss Jones, found her about dusk that afternoon when she visited the house in response to the wife's call of distress. As Miss Jones expressed it in her testimony: "Well, I went over there and she was very much upset, had been crying, and she told me Mr. Nichols had left and it was getting dusk and she could not turn on the light, so I went down stairs and someone had removed the fuse and put it on top of the fuse box, and I put it in and turned the switch and everything was all right, so I stayed with her about a couple of hours, and the only fire she had at that time was a fire in the kitchen stove.

"Q. What fuel did you find there? A. She had sticks of wood in the cellar and no coal.

"Q. What provisions? A. Precious little.

"Q. Describe what you found, briefly what you found there? A. Some cold meat in the pan and some talk about potatoes but really I did not see any potatoes."

The defendant, in this plight, stayed in the house alone for three weeks, and when asked: "Why did you stay in the house three weeks after he left," she replied, "Well, I stayed for as long as I could possibly stay, I had to stay some place and I was staying there thinking possibly something, I don't know what, might turn up, and I

stayed there to have a place to stay as long as I could stay, but I didn't have nothing to stay with, so I left."

It was earnestly argued on behalf of the husband that, even if there were no prior agreement, the wife on the day of separation acquiesced in it by laying out her husband's clothes for him, making no protest against his leaving, and bidding him goodbye when he left. It must be borne in mind, however, that it was the husband who suggested and prepared for the separation and who announced definitely in August that he would leave the middle of October. He did not then ask his wife anything about agreeing to his leaving, he simply told her he was going. There was apparently nothing she could do about it. There was no use in protesting, she testified, and so she docilely complied with his request to lay out his clothes and when he and his daughters went off and left her alone, she "guesses" she did bid him goodbye.

To say that under such circumstances the wife agreed to this so-called "separation," or that it was voluntary on her part, would be contrary to both the letter and spirit of the statute, as construed by this court. It would, likewise, be neither reasonable nor natural for a spouse to agree to be left alone, abandoned and unprovided for, which was precisely what happened to the wife in this case.

From the facts and circumstances here, it is altogether likely that the plaintiff and the defendant would have voluntarily separated within the meaning of the statute, if some provision had been made for the defendant's future maintenance. The plaintiff, himself, names that as the condition for the alleged agreement of June 15, 1936, but with that condition admittedly unfulfilled, the whole theory of agreement, or "willing concert," is eliminated from the case.

Still another circumstance tending to completely and effectually negative the suggestion that the separation was voluntary on the part of the defendant is that, within two months after the husband left in October, she filed

a suit for divorce against him, alleging abandonment and desertion. In that suit she also asked for alimony *pendente lite,* but the court denied this to her, and for some unexplained reason the case was not followed up. The record shows that it is still pending. However, the wife's very act in filing the suit at all, and filing it as promptly as she did, shows conclusively that these parties at that time were not "voluntarily living separate and apart," as prescribed by the statute.

The separation took place October 18, 1936; the wife's suit charging abandonment was filed December 17, 1936; and the husband's suit under the "Five Years Voluntary Separation Act," was filed October 22, 1941. It is obvious, therefore, that the requirement of the statute that the separation must have been a voluntary one, and continued as such for "five consecutive years," was not complied with when the husband's suit was filed.

This brings the pending case still closer within the reasoning and ruling in the Campbell case (174 Md. 229, 239, 198 A. 414), for there the ground on which this statute (Chapter 396, Acts of 1937) was held to apply was that the separation, originally involuntary as to the wife because of the husband's misconduct, eventually became voluntary as to both after a period of five consecutive years of acquiescence and after the wife had relied on the provisions of the original deed of separation. Here there is not only no deed or agreement of separation between the parties but at the very beginning of the period of "five consecutive years" the wife emphasized non-acquiescence on her part by filing a suit on the ground of abandonment. This direct contrast in the factual situation between the two cases serves to accentuate the court's ruling in the Campbell case and its applicability to the particular issue now before us. In the former case the statute applied because of the element of acquiescence throughout the prescribed period, while here it does not apply because of the lack of that very element.

Inasmuch as in the case now before us, the proof does not measure up to the requirements of the particular statute invoked, as repeatedly interpreted by this court, it follows that the plaintiff is not entitled to a divorce, and the decree of the chancellor must, therefore, be reversed.

*Decree reversed and bill of complaint dismissed, the appellee to pay the costs.*