LLOYD *v.* LLOYD

[No. 114, October Term, 1953.]

*Decided April 27, 1954.*

The cause was argued before BRUNE, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*John Wood* for appellant.

*Donald C. Sponseller* for appellee.

BRUNE, C. J., delivered the opinion of the Court.

In this case, a husband brought suit for an absolute divorce on the ground of voluntary separation; his wife

admitted the separation but denied that it was voluntary. From the dismissal of his bill of complaint, the husband appeals. The pertinent statutory provision is Code (1951), Article 16, Section 33, which authorizes an equity court to grant a divorce *a vinculo matrimonii* "when the husband and wife shall have voluntarily lived separate and apart, without any cohabitation, for three consecutive years prior to the filing of the bill of complaint, and such separation is beyond any reasonable expectation of reconciliation."

Appellant married appellee on July 5, 1944, at Hanover, Pennsylvania, and they spent a brief honeymoon at Starner's Dam in Carroll County, Maryland. After appellant returned to his duties in the wartime service of his country, appellee resided at her parents' home in Hanover, where appellant visited her whenever he had a leave. However, she and the appellant were able to live together for a few months first in Philadelphia, then in New London, Connecticut, and later in California. A son was born July 21, 1946. Shortly after appellant's discharge from the armed forces in November, 1947, they purchased a house at Starner's Dam. Each contributed toward the purchase price. Appellee's mother testified that the wife's contribution was three times that of the husband. At the wife's suggestion, this house was sold about six months later, and a new home was purchased at Littlestown, Pennsylvania.

The wife's health, good until pregnancy, had become impaired after the birth of the child. Her condition was diagnosed, early in 1948, as multiple sclerosis. This progressive disease so handicapped her in the performance of her normal household duties that by the fall of 1949 the husband, who was attending Gettysburg College in the morning and working at the Cambridge Rubber Company at night, had to perform an increasing number of household duties. Appellee's mother came, one day a week, from Hanover to do the cleaning.

Appellee then suggested that they sell the Littlestown house and move to Hanover. This the husband declined

to do. On October 21, 1949, the wife and child were taken, at her request, by her parents to their home in Hanover, where they have remained ever since.

The Chancellor has ably summarized the conflicting versions of the events leading up to the separation. First, we quote below from his summary of the husband's version: "After living there for several months, the wife became dissatisfied and wanted to sell the property and buy one in Hanover. Properties were scarce and prices were high, and he did nothing. They stayed at the Littlestown home against her wishes. He claimed that his mother-in-law interfered in every possible way because she resented him very much; that she would upset his wife and then he and his wife would have 'verbal battles.' He then testified that in October, 1949, his wife felt they 'couldn't get along' and that she would take the child and go to her parents' home. He refused to take her, and one day when he came from College he found she had gone with the baby. He learned that his father-in-law, accompanied by William Bair, had removed some furniture, including the furniture from the child's room, and all of their clothing. He objected to taking his wife to visit her mother because of the mother's interference and because she was instilling in her daughter belief in voodoo or witchcraft."

"[The husband's mother] testified she visited her son's home and that she could plainly see that her visits were displeasing to the defendant, that the wife was very much dissatisfied and wanted to go to her mother. While her son treated his wife very nice, she would nag him and she heard her curse him on several occasions."

Of the other side of the case, the Chancellor said (in part): "Mrs. Mary Berwager, the mother of the defendant [appellee] testified that her daughter * * * has multiple sclerosis and was unable to do her work and look after the child. * * * On October 21, 1949, the defendant said to her father, 'Dad, can Jim [the child] and I come home.' The father answered affirmatively and her daughter and grandson came to her home. At

that time her daughter could not walk alone and could not feed herself. She is now bedfast and has been so for three years. * * * The defendant could not appear in Court, and by agreement of counsel her testimony was taken at Hanover, Pennsylvania. The reporter stated, 'It was necessary to use an interpreter (Mrs. Mary Berwager), because of the inability of the witness (the defendant) to enunciate properly.' She said she left her home in October, 1949, when she could no longer do her work. When asked if she wanted to leave her husband she said 'no' and her reply was 'no' to the question 'Did you want him to leave you?' "

From the settlement of the proceeds from the sale of the Littlestown house, appellee received $1,283.68. The husband has been paying approximately $17.00 a week toward the support of his wife and child; and appellee has been receiving an additional sum (now $41.50 per month) from the Veterans' Administration out of the husband's disability compensation.

No "reconciliation" (if such a term is appropriate on the facts of such a case as this) has ever been sought by either of the parties; there has been no cohabitation for over three years, and, as the Chancellor found, "from the physical condition of the wife, it is apparent they will not live together again."

There is no question as to the existence or seriousness of the affliction from which the wife was suffering. Undoubtedly, some of the irritations and friction testified to in the case were attributable to the nature and effects of multiple sclerosis, as it is described in *Alpers, Clinical Neurology* (2nd Ed.) 673, 674, 687. This neurological disease, the cause of which is unknown, appears most frequently in individuals between the ages of nineteen and thirty, and is sometimes precipitated by pregnancy and childbirth. The author states that: "Emotional disturbances of some sort are usually present. Lability of emotional responses, with inability or decreased ability to inhibit emotional reactions, is probably the most common manifestation. These affective disorders are

part and parcel of the disease, are very frequent, and in a fair number of instances they precede the neurological signs."

The quoted language may, in some measure, explain testimony of appellant's mother that appellee was "very nervous" since marriage, on occasions lost her temper, and argued with, "cursed", and "said nasty things" to appellant. Some light may also be shed upon the "crying spells" to which appellant testified.

It seems clear, on the other hand, that during the parties' residence at Littlestown the husband was doing all that could reasonably have been asked of him in caring for his wife and child and in helping to keep the household going. This he did in spite of the fact that outside of his college hours he was employed on an eight-hour shift—from 11:30 P. M. to 7:30 A. M. daily.

The evidence, we think, supports the Chancellor's finding that the separation of the parties was not, at the outset, voluntary within the meaning of our divorce statute.

Although the testimony was somewhat conflicting as to the extent of the wife's disability in October, 1949, immediately prior to the separation, it is clear that it was serious and that she was unable to care adequately for herself and the child.

All of these facts faced the Chancellor in determining whether there was a voluntary separation. "The word 'voluntary' signifies willingness. When used in reference to an act of an individual, it means that he acted of his own free will, when used in reference to a common act of two or more persons affecting their common relationship, it means that they acted in willing concert in the doing of the act." *Kline v. Kline,* 179 Md. 10, 15, 16 A. 2d 924. See also *France v. Safe Deposit & Trust Co.,* 176 Md. 306, 326, 4 A. 2d 717; *Beck v. Beck,* 180 Md. 321, 24 A. 2d 295; *Foote v. Foote,* 190 Md. 171, 179, 57 A. 2d 804.

This Court has declared, "Unless the parties agree to live apart the separation cannot be voluntary. It would

hardly be contended that if one spouse is confined in a hospital as a helpless invalid that the separation is voluntary." *France v. Safe Deposit & Trust Co., supra,* 176 Md. at 326. This principle would seem to govern the case at bar. The evidence, we think, was ample to support the Chancellor's finding that the wife "left home because she was physically unable to do her work and she needed help." His further conclusion that "It was not unreasonable that she would go to her mother" seems obviously sound—particularly in view of the husband's reported refusal, on the ground of expense, to hire a woman to do the cooking and cleaning.

It may also be noted that the husband had declined shortly before the separation to take the wife to her parents' home, and her actual departure was without his knowledge or consent at the time when she left Littlestown.

This Court has, however, repeatedly indicated that a separation which was involuntary when it first occurred, may later become voluntary. *Campbell v. Campbell,* 174 Md. 229, 198 A. 414; *Beck v. Beck, supra,* 180 Md. at 323; *Nichols v. Nichols,* 181 Md. 392, 30 A. 2d 446; *Ashman v. Ashman,* 201 Md. 445, 449, 94 A. 2d 257. It therefore is necessary to consider whether the separation did become voluntary at some time after its inception.

To support his contention that it did, the appellant relies on three things: (1) the fact that the wife took some household furnishings and appliances to her parents' home, agreed to the sale of others and of the home and accepted part of the proceeds of sale thereof; (2) that her attorney at Hanover indicated that she was perfectly agreed to a divorce if the appellant would give her four thousand dollars in cash; and (3) that on January 19, 1950, the appellee said to the appellant, "So far as I am concerned, we are through."

All of these matters were, of course, before the Chancellor, as were the wife's statements denying that she wished the separation, which were transcribed by the

court reporter as "translated" by her mother. The appellant himself testified before the Court below.

As to the first, the physical condition of the wife would seem to have left her no such choice as to constitute an election; and as to the second, the statement attributed to the wife's Hanover counsel would show a willingness to consent to a divorce upon a condition which was not met, not an existing mutual agreement to live separate and apart. *Nichols v. Nichols,* 181 Md. 392, at 398-399, 30 A. 2d 446.

The third point—the wife's statement testified to by the husband that so far as she was concerned "we are through"—was, of course, before the Chancellor, and this testimony was set forth in his opinion. Weighing this testimony, and any inferences to be drawn from it, and the plaintiff's other testimony against the wife's denial of the voluntary nature of the separation and the testimony relating to the illness which caused her to seek help at the home of her parents and which since then has grown progressively worse, the Chancellor held that a voluntary separation—that is, a separation based upon a mutual agreement—had not been shown. Even the realization by both husband and wife that their separation is final—and the wife's statement in this case may have meant no more than such a realization on her part—does not of itself establish an agreement that they shall live apart. *Beck v. Beck,* 180 Md. 321, 24 A. 2d 295. We do not think that the evidence is such as to warrant us in overturning the finding that "there was no voluntary separation entered into in October, 1949, or at any time thereafter."

It is strenuously urged on behalf of the appellant that no possible harm could come to anyone from the granting of a decree in this case—that the denial of a divorce would be of little value to the wife and would leave the husband under a restriction which serves no useful purpose. It is perfectly apparent from the record that the case is a pitiful one viewed from the point of view of either spouse. However, these considerations do not

enlarge the causes for which the Legislature has authorized the courts to grant divorces. It was held in *Smith v. Smith,* 198 Md. 630, 84 A. 2d 890, that a divorce could not be granted simply because it would be beneficial to the parties. If benefit to the parties is not sufficient to support the granting of a divorce, certainly the absence of harm is not.

For the reasons above stated, the decree must be affirmed.

> *Decree affirmed, with costs to the appellee.*