MILDRED F. LUKAT *v.* FRED EDWARD LUKAT

[No. 631, September Term, 1973.]

*Decided May 22, 1974.*

The cause was argued before ORTH, C. J., and GILBERT and LOWE, JJ.

*Joseph W. Powers, Jr.,* for appellant.

*Durke G. Thompson,* with whom were *Bruce N. Goldberg* and *Goldberg & Thompson* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

The marriage of Fred Edward Lukat and Mildred F. Lukat, whom God had joined together on October 17, 1953, was put asunder by Judge Plummer Shearin on July 16, 1973. Mrs. Lukat protests that decision of the Circuit Court for Montgomery County, although she originally sought a similar conclusion when she filed a Bill on March 29, 1971 complaining that she had been deserted by Fred "on or about November 10, 1970." This allegation was denied by Mr. Lukat.

On June 21, 1971, however, she obtained an order awarding her temporary support, maintenance and counsel

fees for the period during which litigation was pending. Out of fear that her husband intended "speedily to leave this State and the jurisdiction of this Court with intent to evade the obligation . . .," Mrs. Lukat obtained a Writ Ne Exeat.

During the ensuing four months, Mr. Lukat paid only half of the prescribed obligation to his wife and none to her counsel, who at the time was her brother-in-law. A contempt proceeding was instituted. The husband's response admitted some lapse of payment, though not to the extent alleged. He explained this deficiency by citing a lack of funds, a set off of a preexisting debt owed him by his wife's counsel (and brother-in-law) and the fact that Mrs. Lukat resided in his apartment for approximately one month following the signing of the pendente lite order. Simultaneously he moved for a reduction of temporary maintenance and support and a dissolution of the ne exeat bond.

The matter was set for hearing. When the parties were together at the Courthouse prior to the hearing, an agreement for settlement of the controversy was reached. Upon oral motion reciting the agreement of the parties, the contempt and reduction of support petitions were withdrawn and the ne exeat bond was dissolved. The consummation of that understanding, reduced to a "Voluntary Separation Agreement", executed January 28, 1972, heralded the advent of peace — if not tranquility. But lurking within that document signalling peaceful coexistence was an apparently innocuous recitation that the parties had voluntarily separated on the 19th day of November, 1970, and have "not lived or cohabited together since that time . . . ."

The episode which put the lie to those eight crucial words arose from an incongruous circumstance. Mrs. Lukat returned to the marital abode on August 20, 1971. She did so against the will of her husband who acquiesced only to keep peace. Since the bedroom was occupied by Mr. Lukat's ailing mother, and the daybed by appellee (who did not desire her presence), Mrs. Lukat slept on a sofa until her ultimate departure on October 2, 1971. The normal marital relation did not exist and neither allege that sexual intercourse

occurred; for that matter, there appeared but limited social intercourse.

On May 3, 1972, Mr. Lukat filed a Cross-Bill of Complaint for Divorce A Vinculo Matrimonii on the grounds of voluntary separation. He "annexed" a copy of the Voluntary Separation Agreement of January 28, 1972. On June 16, 1972 Mrs. Lukat's counsel (and brother-in-law) filed a motion for leave to strike his appearance. His motion recited the making and execution of the separation agreement (which was notarized by Mrs. Lukat's sister who was counsel's wife) and the Cross-Bill filed by Mr. Lukat. He stated that his client disputed the voluntariness of the separation, denied that she understood the agreement "and dispute[d] the several provisions of the agreement contrary to the understanding which movant believed to have been reached at the time the agreement was made." He then asserted that he could not therefore represent her in the matter. His motion was granted.

After employing new counsel, Mrs. Lukat filed an answer denying the voluntary separation, asserting cohabitation from August 20th to October 2, 1971, and, though admitting signing the January 28th agreement, alleging it was "involuntary" by virtue of a nervous disability for which she had recently been hospitalized.

Mr. Lukat then moved for, and was granted, leave to amend which he did by adding, as Count II, an alternative to the ground of eighteen months voluntary separation. He alleged desertion by Mrs. Lukat on October 2, 1971.

The chancellor found as a fact that the execution of the Voluntary Separation Agreement by Mrs. Lukat was her voluntary act, with advice of counsel, and that its contents were understood by her at the time. He found that there had been cohabitation for the period stated, though no marital relations. He found further that Mrs. Lukat despaired of a reconciliation and on October 2nd left the premises. This period of cohabitation interrupted the separation which Art. 16, § 24 of the Md. Code required, i.e., that the parties " . . . [live] separate and apart, without any cohabitation, for eighteen consecutive months . . . ." That sexual relations did

not occur is of no consequence; the determinative factor is the undisputed finding of a period of cohabitation, for the "[r]esumption of cohabitation during the statutory period interrupts the running of the statute . . . ." *Lillis v. Lillis,* 235 Md. 490, 495.

The question that the chancellor felt he must decide was "whether or not that period of living under the same roof worked by operation of law a recision or invalidation . . . of the formal separation and property agreement that was entered into several months previously." He then sought to ascertain the intention of the parties as to recision from their having cohabited together.

The chancellor found that while Mrs. Lukat seemed to desire a reconciliation,

> " . . . it is equally clear that Mr. Lukat did not. There was no meeting of the minds by these parties. From October 2nd the parties again acted in reliance upon the agreement. The husband was paying the sums of money required thereby to the wife for her support and the wife in other respects merely receiving the money, apparently in reliance upon the agreement."

Relying on *Frana v. Frana,* 12 Md. App. 273, 283-285, the chancellor concluded that the cohabitation did not "annul, void or rescind the separation and property settlement agreement."

The inferences drawn by the court would have been reasonable had not the abortive attempt at reconciliation while cohabiting together occurred over three months *before* the parties entered into the Voluntary Separation Agreement. Mrs. Lukat returned to the abode on August 20, 1971 and having "despaired of any meaningful reconciliation" terminated the joint occupancy on October 2, 1971. It was not until January 28, 1972 that the agreement was finally executed. It is difficult to see how a prior attempted reconciliation could affect a contract subsequently entered into. Mrs. Lukat's execution of the "voluntary" agreement four months after the cohabitation

takes on significance as to her allegation that the separation was involuntary in its origin and remained so throughout. A separation may be involuntary when it first occurs and later become voluntary, or it may begin at any time after the physical separation. *Misner v. Misner*, 211 Md. 398.

The court arrived at the right result, however, if for the wrong reasons. Had the chancellor recognized that the cohabitation was concluded five months *before* the agreement was executed, the conclusion he reached would have arrived more easily. It is not only conceivable, but logical, that after a somewhat stormy initial period of separation, interrupted by an abortive attempt at reconciliation, both parties became resigned to separate lives and resolved by the agreement to effect the result amicably. A voluntary separation agreement, executed under oath, has been sanctioned by the Legislature as "full corroboration of plaintiff's testimony as to the mutual and voluntary nature of the separation . . . ." Md. Code, Art. 35, § 4. (Now Section 10-901 of the Court's Art.) Upon finding as a fact that the agreement had been executed voluntarily and knowingly by Mrs. Lukat, with advice of counsel, the chancellor could properly have used it to corroborate Mr. Lukat's testimony that the separation of October 2, 1971 was voluntary.

Appellant sets forth a series of objections, defenses and arguments. She contends first that her filing suit on desertion grounds prompted by the November 19, 1970 separation and her husband's answer, "showed conclusively that the parties . . . were not living voluntarily separate and apart," citing *Nichols v. Nichols*, 181 Md. 392. *Nichols* does not hold that the filing of such suit "showed conclusively" that the separation was involuntary, it states that such suit was "another circumstance" tending to negative the suggestion of voluntariness, *i.e.*, some evidence but not necessarily conclusive.

The next argument logically follows, that the adversary court proceedings reflected by the docket entries indicate an unpleasantness that does not connote voluntariness. Again the Court of Appeals, as if anticipating appellant's argument, laid down the proposition that a voluntary

agreement to live separate and apart need not be arrived at with calmness and courtesy or without anger. *Matysek v. Matysek*, 212 Md. 44.

Appellant then brands as a "substantial distortion of truth" the recitation in the Voluntary Separation Agreement that the parties hadn't lived together or cohabited since November 19, 1970. In the face of the doctrine of clean hands, appellant's argument appears meritless. Without evidence offered of an intent to defraud or collude, the chancellor had no cause to question the stock phrase of non-cohabitation. Every indication points to the parties' lack of concern over the "Whereas" recitations and an acceptance of the customary misapprehension that denial of marital relations was sufficient to effect a "legal separation." Indeed the parties paid so little attention to the recitations that they overlooked a seven month error in the date they were married. With these two mistakes side by side it would be difficult to infer collusion to defraud the court. Even appellant does not go that far.

In passing, appellant notes that the "parties did not live separate and apart for eighteen (18) consecutive months prior to the filing of the Cross-Bill of Complaint on May 31, 1972." The Chancellor explained his computations in his opinion:

"So from October 2nd, 1971, when the period of joint occupancy of the apartment ended to May 25, 1973 when the amended bill of complaint was filed in this case, is a period of nineteen months and twenty-three days. And if the voluntary separation and property settlement agreement was not annulled, which I have held, and if the parties again acted in reliance upon and recognized and otherwise breathed new life into that agreement,[1] then the

1. The court was, as explained, operating under an erroneous impression as to the sequence of the cohabitation and the execution of the agreement. Although we accepted the chancellor's findings in all other particulars, *see* Levy v. Levy, 229 Md. 103, the sequential misunderstanding, patently obvious from the record though not raised on brief, was recognized and considered in this opinion.

question is whether or not the necessary period of separation without cohabitation has expired. Quite clearly it has, the period being more than eighteen months prior to the filing of the amended bill of complaint." (Footnote added.)

The court apparently overlooked the fact that the statutory ground of voluntary separation requires that the period of non-cohabitation be " . . . prior to the filing of the bill of complaint . . . ." Md. Code, Art. 16, § 24.[2] This means, of course, that " . . . the ground must exist when the suit is filed." *Buckheit v. Buckheit,* 10 Md. App. 526, 530. Moreover, an amendment is not the proper procedure to assert " . . . allegations of facts essential to the relief prayed, occurring subsequent to the filing of the original bill . . . ." *Smith v. Smith,* 216 Md. 141, 148. For divorces sought on grounds of voluntary separation, the Legislature considered the fulfillment of the prescribed period of non-cohabitation prior to the filing of the bill of complaint a factor of sufficient importance to state it as a statutory prerequisite. The significance given by those responsible for the enactment of our laws alone would cause it to be a "fact essential to the relief prayed."

*Smith,* decided in 1958, dealt with a divorce sought on grounds of constructive desertion, the statutory grounds for which did not contain the statutory language " . . . prior to the filing of the bill of complaint . . . ." Nevertheless, the Court decided that facts occurring after the filing of the original bill could not be " . . . brought in either by way of amendment *or* supplemental bill." *Smith v. Smith, supra,* 148. (Emphasis added.) This harsh pleading principle seemingly alien to a "court of conscience," which apparently precluded any alternative short of commencing anew, was leavened by the adoption of Md. Rule S72 c 1 by the Court of Appeals less than a year later. The new rule permitted grounds arising subsequent to the original bill to be asserted by *supplemental bill.* It did not, however, permit essential

**2.** The waiting period has since been reduced to twelve months. Ch. 699, Laws of Md., 1973.

facts occurring after suit was filed to be brought in by amendment; nor has any subsequent rule, statute or case since done so.

The amendment to appellee's cross-bill merely added the ground of desertion (which the chancellor found no evidence to substantiate) for the period following the cohabitation. It did not assert the new or renewed voluntary separation. Had leave been sought and granted to plead de novo, the former pleas might have been held to be withdrawn, and the amended cross-bill could have been accepted as a supplemental bill by the chancellor.[3] But leave was sought and granted to amend by *adding* the new second count and the original pleading was not thereby withdrawn. 2 Poe, *Pleading and Practice*, § 189. The original cross-bill continued in being, and it tolled the running of the period of non-cohabitation much as the filing of an original pleading tolls a limitations period.[4]

It is therefore inescapable that, in spite of the equitable and otherwise proper result reached by the Chancellor, the judgment must be vacated. Nevertheless, we note that the evidence is ample, if not exhaustive of the issues, and as a consequence see no purpose to be served in requiring the same evidence be reheard. Our overall review revealed nothing so clearly erroneous in the Chancellor's findings of fact as to warrant reversal, nor do we fault the result he reached. The judgment will therefore be vacated simply to permit the submission of an appropriate supplemental cross-bill of complaint and any new evidence which may have become available since the prior hearing.

So long as the Rules of Procedure provide for the distinction between amendatory and supplemental

---

**3.** Whether a pleading is amendatory or supplemental must be determined from its substance rather than from the title given it by the pleader. *C.J.S., Pleading* § 327.

**4.** An analogy exists between an initial pleading's serving to toll the running of a statutory time period in a voluntary separation divorce and an initial pleading's tolling the running of a period of limitations. The running of neither statutory time period is begun again by an *amendment.* Also the time is computed back from the date of the plaintiff's original pleading. *See* 1 Poe, *Pleading and Practice,* § 619 (Tiffany Ed.).

pleadings, conformity to those rules will be expected. Avoiding the costs and vexations of another full hearing which could serve little or no purpose does not violate those rules.

> *Judgment vacated and case remanded to permit additional pleadings and evidence in accordance with this opinion. Costs to be paid by the appellee.*